489 F.2d 1377
 Victor FREITAG, Individually and on behalf of others
similarly situated, Plaintiff-Appellee,
v.
James Y. CARTER, Individually and in his official capacity
as Commissioner ofthe Public Vehicle License Commission of
the City of Chicago, and the City ofChicago, a municipal
corporation, Defendants-Appellants.
 No. 72-1679.
 United States Court of Appeals, Seventh Circuit.
 Argued May 31, 1973.
Decided Dec. 10, 1973.
 
 Richard L. Curry, Corp. Counsel, William R. Quinlan, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellants.
 Thomas P. Stillman, Chicago, Ill., for plaintiff-appellee.
 Before PELL and STEVENS, Circuit Judges, and REYNOLDS,* District judge.
 PELL, Circuit Judge.
 
 
 1
 After the Public Vehicle License Commission of the City of Chicago allegedly denied his application for a chauffeur's license, Victor Freitag filed a class action against the head of the Commission and the City of Chicago challenging the constitutionality of the City's licensing ordinance.[1] The complaint, grounded on 42 U.S.C. 1983, alleged that the ordinance failed 'to provide for notice of reasons for denial of a license and (for) a hearing.' In addition to a declaration of the ordinance's unconstitutionality, Freitag sought an injunction and, for himself, $25,000 damages.
 
 
 2
 Both plaintiff and defendants moved for summary judgment. While these motions were pending, the Commissioner issued the license to Freitag.[2] The district court declined to hold that the case was mooted and granted Freitag's motion for summary judgment.[3] The court concluded (1) the ordinance was invalid on its face, and (2) plaintiff had been denied due process. The defendants appeal, raising four issues: (1) the judicial remedy of mandamus was readily available against an improper denial of a license; (2) whether Freitag, in fact, had been denied due process by the defendants; (3) whether the case has been mooted; and (4) if the constitutionality issue is not moot, whether a licensing ordinance, to be valid, need expressly provide for notice and hearing.
 
 
 3
 * On January 4, 1971, Freitag, wishing to drive a taxicab within the City of Chicago, applied to defendant Carter, the Commissioner of the Public Vehicle License Commission, for a public chauffeur's license which Chicago cab drivers are required to have.
 
 
 4
 While investigating the application, Carter learned that Freitag had previously been a patient in a state mental hospital.[4] Section 28.1-3 of Chapter 28.1 of the Municipal Code lists lack of 'infirmity . . . of mind' as a prerequisite for the issuance of a public chauffeur's license. In a letter to Freitag dated January 19, 1971, Carter denied the application. However, the letter also stated, 'If you wish to have this denial reviewed, please call at this office . . ..' review and, on January 21, 1971, the Commissioner, after obtaining Freitag's permission, wrote the state mental hospital requesting information regarding plaintiff's condition at the time of his discharge from the institution and information pertinent to Freitag's ability to drive a cab. In response, the Administrative Physician at the hospital gave a brief history of Freitag's connections with the hospital,[5] described his mental condition at the time of his hospitalization, and stated that the hospital had had no contact with Freitag since October 1957. The record does not reveal that defendant Carter showed plaintiff the Administrative Physician's letter or the hospital records.
 
 
 5
 Upon receipt of the letter, Carter's office forwarded it to the Medical Section of the Chicago Police Department, which, on February 5, 1971, indicated that Freitag might be a 'bad risk.' This evaluation apparently was based solely on the fourteen-year-old information, for no expert assessed Freitag's mental condition as of 1971. If so, it would appear to reflect an archaic attitude in the field of mental health. Indeed, the defendants never gave plaintiff any mental tests nor were there facts before fore the Commissioner to indicate any present questionable mental status.
 
 
 6
 Receiving no word from Carter on the had told him to deny the license. 1971 telephoned the Public Vehicle License Commission. Freitag claims that he was told his application had been denied by the Commission's psychiatrist.[6] He asked for an appointment to see Carter.
 
 
 7
 On February 22, 1971, the two met in Carter's office. According to Freitag, Carter stated that the Commission doctor had tole him to deny the license. Carter supposedly then refused to explain why the doctor had so advised. According to the affidavit Carter made for the defendant's summary judgment motion, Carter never announced a final denial of plaintiff's application. the Commissioner maintains that he had merely indicated to Freitag that further investigation would be necessary.
 
 
 8
 After this conference, Freitag sought legal aid. His lawyer wrote Carter several letters and interviewed him in an effort to secure Freitag a license. On August 17, 1971, Freitag filed the present lawsuit.
 
 II
 
 9
 Defendants contend that because of the 'ready availability of the traditional mandamus procedure, which in Illinois has long been regularly employed to compel the issuance of licenses improperly withheld,' Freitag has 'no justifiable claim of denial of due process to assert in a federal court.' However, the defendants deny that they are thereby arguing that an applicant must resort to the state mandamus remedy before proceeding in the federal courts to assert or preserve a claim of denial of due process.
 
 
 10
 The heart of Freitag's complaint is the demand for a formal notice of reasons for the denial and a hearing at which he may cross-examine witnesses and present evidence on his behalf. The complaint does not request the immediate issuance of a chauffeur's license, although it does include a prayer for $25,000 damages. We fail to understand why the existence of a state mandamus procedure forecloses Freitag from seeking relief in the federal courts. Perhaps the defendants are really arguing that the license ordinance should be read in conjunction with the state mandamus provisions in order to 'save' the ordinance. Even if that is the proper way to construe the ordinance, that argument does not go to the availability of the federal forum. The mandamus contention, to the extent that the existence of this remedy is supposed to mean that the ordinance considered in the mandamus-availability context therefore provided due process, would not be sufficient to override an actual denial of due process if such is the fact.
 
 III
 
 11
 The defendants contend that the district court improperly granted summary judgment on the issue of whether Freitag was in fact denied due process. They argue that plaintiff clearly was accorded due process or, alternatively, that 'there were, at least, disputed material issues of fact . . ..' We disagree. In our opinion there was 'no genuine issue as to any material fact and . . . the moving party (was) entitled to a judgment as a matter of law.' Rule 56, Fed.R.Civ.P.
 
 
 12
 First, contrary to the defendants' assertion, Commissioner Carter did issue a 'final' denial of Freitag's application for a public chauffeur's license. His letter of January 19th stated, 'This is to advise you that your application . . . has been denied.' Later, after Freitag's legal representative demanded that Freitag be issued a license, Carter wrote the City's Corporation Counsel seeking advice:
 
 
 13
 'When (Freitag's) fingerprints were returned from the FBI in Washington, it showed that he had been a patient at the Manteno State Hospital . . .. He agreed to sign a release letter to the hospital . . .. We then presented (the hospital's) information to the Medical Section of the Chicago Police Department for their opinion which was that Mr. Freitag would be a 'bad risk.' We then notified Mr. Freitag that his application for a public chauffeur's license was denied.'
 
 
 14
 The letter then describes Carter's meeting on May 7, 1971, with Freitag's legal representative: 'No decision was reached other than the license was denied . . ..' The representative's recollection of the meeting corroborates this statement: 'When I asked Mr. Carter the date he denied Mr. Freitag's license, he said that it was not noted in Freitag's file but the date of denial was within a week after receiving the letter of January 29 from Manteno.'
 
 
 15
 The only documents in the record that suggest Carter never made a final denial are Carter's affidavits attached to the defendants' summary judgment motion and answer. In his second affidavit, Carter claimed:
 
 
 16
 'Although both Mr. Freitag and . . . an employee of (his) legal counsel . . . misunderstood my actions and language and interpreted my failure to immediately issue a license to Freitag as a final denial of the issuance of the same, that was never mu intention. Whether or not I actually stated that the failure to immediately issue a license to Freitag was preliminary, final, or otherwise, I intended that it be merely preliminary and assumed Freitag and (his legal representative) had understood it as such . . .. I did not tell (Freitag) that a final denial had been decided upon regarding his license nor did I authorize anyone else to make such a representation to him . . ..'
 
 
 17
 The firm characterization of lack of final denial is undermined by the unequivocal nature of the characterization of the action when it was actually taken. Under these circumstances, Carter's speculations and conclusionary statements concerning his intentions and words enunciated six months after the fact raise no genuine material issue of fact.
 
 
 18
 Second, the summary judgment documents reveal that the defendants failed to accord Freitag due process when denying him a public chauffeur's license. A governmental licensing body which judges the fitness of an applicant must afford that applicant adequate notice and a hearing. See, e.g., Willer v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926). In Goldsmith, the Court held that the Board, although vested with the discretion to deny Goldsmith admission, could exercise that discretion only 'after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process.' 270 U.S. at 123, 46 S.Ct. at 217.
 
 
 19
 Here Carter's 'investigation' consisted of unearthing fourteen-year-old psychiatric records, see Schware, 353 U.S. at 243, 246, 77 S.Ct. 752, and checking whether Freitag had been convicted of a disqualifying offense. At no time did Carter inquire into the plaintiff's present mental condition or show him the 'evidence' against him. Only after he had denied Freitag's application and Freitag had requested and explanation did the Commissioner mention the conclusion of the City doctor that plaintiff might be a 'bad risk.' Carter refused to elaborate on that answer. There is no indication that Carter told plaintiff the name of the police department doctor or gave him an opportunity to question him. See Willner, 373 U.S. at 105, 83 S.Ct. at 1181:
 
 
 20
 'There seems no question but that petitioner was apprised of the matters the Committee was considering. 'But a 'full hearing'-- a fair and open hearing-- requires more than that . . .. Those who are brought into contest with . . . Government ina quasi-judicial proceeding aimed at the control of their activites are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.' Morgan v. United States, 304 U.S. 1, 18-19, (58 S.Ct. 773, 82 L.Ed. 1129) Petitioner had no opportunity to ascertain and contest the bases of the Committee's reports to the Appellate Division, and the Appellate Division gave him no separate hearing.'
 
 IV
 
 21
 Although the defendants apparently had originally urged mootness on the ground that Freitag in fact received a chauffeur's license in October 1971, on this appeal their only mootness claim is that recent amendmants to the Chicago Municipal Code have rendered the declaratory judgment (and injunctional) portion of the district court's order holding the ordinance unconstitutional 'not only erroneous, but also moot.' The amendments to which the defendants advert concern Chapter 101 of the Municipal Code, 'General Licensing Provisions.' Adopted by the City Council on August 30, 1972, the amendments provide, as the defendants assert, 'a definite time-scheduled procedure of administrative notice and hearing.'
 
 
 22
 The determinative issue, therefore, is whether the amended sections of Chapter 101 apply to applications for public chauffeur licenses, the specific subject of Chapter 28.1 of the Municipal Code. The matter admits of no easy resolution, for Chapter 101 is not a model of adept drafting and the ordinances contain no cross-referencing provisions.
 
 
 23
 The 'due process amendments' are part of section 101-5 the pertinent passages of which refer to the Mayor, not to the Commissioner of the Public Vehicle License Commission: 'If the mayor disapproves the license application the unsuccessful applicant shall be notified in writing, of the reasons for the disapproval,' etc. 'The mayor shall within 15 days after such hearing has been concluded . . ..' Section 28.1-4 of Chapter 28.1 states in part: 'If the commissioner shall be satisfied that the applicant is of good character and reputation and is a suitable person . . . he shall issue the license.' Further, section 101-5 of Chapter 101, which also discusses investigations of license applications, provides ofr the city collector to play a role in the investigations but the city collector is nowhere mentioned in the investigation portions of Chapter 28.1.
 
 
 24
 These seeming inconsistencies lead Freitag to conclude that 'it is doubtful that the General Licensing Ordinance controls the Public Chauffeurs' Licensing Ordinance . . ., which has not been amended.' However, this conclusion ignores other sections of the General Licensing chapter that strongly suggests that the chapter is meant to apply to all licensing situations except where 'otherwise specifically provided.' Because Chapter 101 does not itself note these 'otherwise' exceptions, we must assume that we are to find the exceptions from a reading of the rest of the Municipal Code. In short, the duty to reconcile apparently conflicting chapters and to interconnect the various requirements set out in several chapters falls on the readers of the Code, the drafters of the Code having neglected such niceties. Cf. section 1-19: 'All general provisions, terms, phrases, and expressions contained in this code shall be liberally construed in order that the true intent and meaning of the city council may be fully carried out.'
 
 
 25
 Our reading of Chapter 101 as a whole, with particular reference to sections 101-1 through 101-4, the sections preceding the 'due process' provisions, convinces us that the city council did not intend to limit the chapter to only those licenses which the Mayor is authorized to grant. Under this interpretation, the administrative procedures set out in Chapter 101, section 101-5, apply to the denial of a public chauffeur's license. We realize that this entails the substitution of the words 'Commissioner of the relevant Commission' and 'head of the pertinent department' for the word 'mayor' in some of Chapter 101's provisions, but this interpretation seems more consonant with the tenor of the General Licensing chapter than does Freitag's approach. No completely satisfactory resolution of the problem is possible.
 
 
 26
 Turning to the judgment of the district court in the light of the foregoing discussion, we note that the order of February 14, 1972, which was incorporated by reference in the final judgment of June 5, 1972, held that Chapter 28.1 et seq. is unconstitutional because 'it does not provide for adequate notice and hearing procedures in the event of disapproval of an application for a chauffeur's license.' The order then stated, 'Any applicant denied a chauffeur's license shall be given adequate notice of the reasons therefor and a hearing which complies with the standards of procedural due process.'
 
 
 27
 The two-pronged attack of the defendants is that this portion of the holding is erroneous because it is not necessary that the ordinance expressly provide for notice and hearing and that, in any event, since another ordinance now provides for notice and hearing for chauffeur license applicants, the questions is moot.
 
 
 28
 As we have indicated, the amended General Licensing Ordinance, which was not before the district court, can be so read as to provide for notice and hearing. We, therefore, do not deem it necessary to decide the facial constitutionality question, although we note the language of Judge Kiley in a recent decision of this court, Brooks v. Center Township, 485 F.2d 383, 385 (7th Cir. 1973):
 
 
 29
 'We hold that the statute is constitutionally infirm facially for want of due process in failing to provide, inter alia, a pre-termination hearing, an effective opportunity for Brooks to defend, and want of due notice of reasons for termination. Goldberg v. Kelly, 397 U.S. 254, 264-268, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).'
 
 
 30
 Irrespective of the decision that might be reached on the facial unconstitutionality question here, the fact is that the district court correctly determined that Freitag was denied procedural due process.
 
 
 31
 Although we have referred in this opinion to the 'defendants,' under the authority of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), only Commissioner Carter is properly a party defendant. Neither party to the appeal questioned the jurisdiction of the district court but in the light of the last cited authorities the district court did not have jurisdiction over the municipality in this 1983 action. Accordingly, we reverse the judgment as to the City of Chicago.
 
 
 32
 Insofar as the judgment of the district court orders 'any applicant,' presumably referring to the members of the class in the action below, to be provided procedural due process, since the amendments to the General Licensing Ordinance were not effective at the time the final judgment order was entered, we affirm as to the Commissioner that portion of the judgment inasmuch as it merely makes it clear that any other applicant for such a license is entitled to due process irrespective of whether the chauffeur's ordinance spells out the steps thereof. The defendants, conceding that the General Licensing Ordinance does spell out those steps and that they are applicable to the present type of situation, would seem to have little ground for complaint in the affirmance of the judgment below as to the Commissioner, which we now order. Finally, by virtue of the affirmance herein ordered, Freitag is entitled to recovery from the Commissioner of the stipulated damages in the amount of $1500. The cause is remanded for the entry of the damage judgment.
 
 
 
 *
 Chief Judge John W. Reynolds of the Eastern District of Wisconsin is sitting by designation
 
 
 [1]
 Chapter 28.1, 'Public Chauffeurs,' provides in pertinent part:
 '28.1-3. Applications for public chauffeur licenses shall be made in writing to the commissioner upon forms provided by him therefor. They shall . . . disclose any information as to (the applicant's) character, reputation, physical qualifications, past employment and conduct which the commissioner deems relevant to the question of qualification of the appliciant . . ..
 'Every applicant shall . . . not be subject to . . . infirmity of body or mind . . . which may render him unfit to drive a public passenger vehicle.
 '28.1-4. The character and reputation of each applicant shall be investigated under the supervision of the captain of the police district in which the applicant resides, and a report of such investigation . . . shall be forwarded by the captain to the commissioner of police, who shall forward the same to the commissioner together with his recommendation. If the commissioner shall be satisfied that the applicant is of good character and reputation and is a suitable person to be entrusted with driving a public passenger vehicle he shall issue the license. Pending such investigation the commissioner may issue a temporary permit . . ..
 '28.1-6. The fingerprints of each applicant shall be submitted to the commissioner of police for examination into the criminal record, if any, of the applicant.'
 
 
 [2]
 Before the lawsuit was filed, the Commissioner had written Freitag advising that his application had been reconsidered but was being held up until another set of fingerprints could be taken. The defendants complain of the fact that Freitag, instead of submitting a second set of fingerprints, proceeded with the filing of his lawsuit. The letter, however, does not clearly state that the application would be granted on the second submission of fingerprints, there merely being reference to the application's being reconsidered. Further, the purpose indicated by the defendants for the second set of fingerprints was to ascertain whether Freitag might have been convicted of disqualifying offenses in the period of time elapsing after the first submission. This would seem to be a questionable basis for the request, as presumably the initial set of fingerprints could have been processed through criminal records for the ascertainment of any subsequent arrests or convictions. In any event, any damages from an earlier denial had already been inflicted
 
 
 [3]
 On this appeal, defendants do not argue that mootness resulted from the subsequent granting of the license
 The order was silent as to plaintiff's demand for damages. In June 1972, however, pursuant to Rule 68, Fed.R.Civ.P., the defendants made an offer of judgment for $1500. Freitag accepted. Payment of the $1500 was conditioned upon Freitag's prevailing on this appeal. By their offer, the defendants did not admit that they are liable or that the ordinance is unconstitutional.
 
 
 [4]
 The application form contained the following: 'Have you ever been under treatment at a hospital or asylum for a mental condition? No ( ) Yes ( ) If so, where and when?' While the record is not entirely clear, it would appear that the particular questions were appear that the particular other questions on the form. The mental institution questions were not answered, although in fact Freitag had been a patient at such an institution. No explanation for the failure appears in the record. There is also nothing in the record to indicate whether the Commissioner's treatment of the application may have been in part an adverse reaction to the omission
 
 
 [5]
 Freitag had been an in-patient for two months in 1957 and an out-patient for four months thereafter. At the time of his commitment, he had 'lost his civil rights.' However, these rights were restored in October 1957 by a state court which found him to be 'without mental illness' and adjudged him 'mentally competent to manage his business, personal and civil affairs without endangering himself or others.' In his complaint, Freitag alleged that he has received no treatment for mental illness since 1957
 
 
 [6]
 Freitag's statement in this respect is the only reference we are able to find in the record to indicate that the doctor in the Medical Section of the Chicago Police Department possessed any qualifications in psychiatry. The affidavit of the Commission employee who talked to Freitag merely states, 'I told Freitag that his application and certain materials in his file had been reviewed by a doctor on the staff of the Chicago Police Department and that doctor had cautioned our office against an immediate issuance of the license sought since it appeared that Freitag may be a bad risk.'